*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 24-CO-0363

JOSEPH E. JACKSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2001-FEL-006799)

(Hon. Kendra Davis Briggs, Trial Judge)

(Submitted May 20, 2025                                    Decided November 13, 2025)

*Jason K. Clark* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney at the time, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Simran Dhillon*, and *Kevin Birney*, Assistant United States Attorneys, were on the brief for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, HOWARD, *Associate Judge*, and GLICKMAN, *Senior Judge*.

GLICKMAN, *Senior Judge*: Appellant Joseph Jackson was convicted in Superior Court in 2003 of first-degree murder and other felonies, and he was sentenced to an aggregate term of thirty-five years' incarceration. Jackson was twenty years of age when he committed the offenses in 2001. Two decades later, he moved for a reduction of his sentence under the Incarceration Reduction

Amendment Act (IRAA), D.C. Code § 24-403.03, which—as amended in 2021—allows the Superior Court to reduce lengthy prison sentences imposed for offenses committed when the defendant was under twenty-five years of age. The court is empowered to grant such relief if the defendant has served at least fifteen years in prison and the court affirmatively finds that the defendant "is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." *Id.* § 24-403.03(a). In making its determination of these criteria, the court is required to consider eleven factors that are listed in subsection (c) of the IRAA. The defendant has the burden of proof.[1]

In this case, the Superior Court denied Jackson's IRAA motion after addressing each of the statutory factors, and he has appealed its ruling. He contends the court erred in its consideration of two of the factors listed in subsection (c): whether his personal circumstances showed his "aging out of crime" (factor ten), and the extent to which "another person" was involved in his offense (factor nine). However, we conclude that the court properly considered those factors, and we affirm its decision.

---

[1] *Bishop v. United States*, 310 A.3d 629, 636 (D.C. 2024).

**I.**

In 2001, according to the evidence at his trial in 2003, Jackson and his co-defendant Troy Ashley were selling crack cocaine on 25th Street in southeast Washington, D.C. After a rival drug dealer named Larry Smith told Jackson he could no longer sell drugs in that territory, Jackson told Ashley to "handle that." To that end, Ashley enlisted and armed an accomplice, Jason Parker, and the two men confronted Smith and two of his associates on July 30, 2001. Ashley shot and killed Smith, and he and Parker robbed and shot the two men who accompanied Smith. Ashley and Parker then reported back to Jackson. Jackson asked Ashley, "Did you take care of that?" Ashley replied, "Did what you asked me to do," and demonstrated how he had "caught Smith with his head coming up." Upon hearing this, Jackson excitedly jumped up and down, unloaded Ashley's and Parker's guns for them, and rewarded Parker for his help with two bags of crack cocaine.

At the conclusion of Jackson's trial, the jury found him guilty of first-degree premeditated murder, armed robbery, and various lesser offenses. This court affirmed his convictions on appeal and remanded the case for merger of some of the offenses and limited resentencing. On remand, Jackson was sentenced to an aggregate term of thirty-five years in prison.

In 2023, Jackson moved in Superior Court for a reduced sentence under the IRAA. He argued in his motion that he had satisfied the criteria set forth in the statute; in particular, he claimed that he had overcome his abusive and traumatic childhood, had matured and had "substantially" complied with Bureau of Prisons rules, and was no longer dangerous. Jackson's sister submitted a letter in his support, in which she described his difficult childhood and expressed her perception that he had matured and "grown into a more responsible individual." The letter's assertions that Jackson had reformed were conclusory and unsubstantiated, however. For example, Jackson's sister stated:

> From a distance, I have been able to witness the changes in my brother. He has grown into a more responsible individual . . . . The fact of the matter is that my brother has been able to repent for his actions, he has been able to grow into the man that he should have grown into so many years ago. I have been able to see his growth since reconnecting with him so long ago. His demeanor has changed significantly, he has totally transformed his attitude . . . . [H]e has now been able to see the errors of his ways and has been able to exhibit the characteristics of a responsible, accountable individual.

But Jackson's sister proffered no facts to justify these impressions—she did not, for example, describe anything Jackson had said or done in prison that demonstrated his maturation or transformation, nor did she address his behavior or any rehabilitative accomplishments while he was incarcerated. The letter stated that Jackson "has a plan to relocate to another jurisdiction immediately upon his release into the

community," and that he "dreams of becoming a business owner, a family man." And his sister stated that she would "ensure" that Jackson is "connected with additional supports in the community," and with "therapeutic services, employment services and . . . resources and services that will allow him the opportunity to give back to his community." The letter offered no specifics, however, nor did it otherwise set out a re-entry plan for Jackson (though Jackson's sister did assure the court that he could reside with her if he were released from prison).

The government opposed Jackson's release, mainly on account of his lengthy and unabated history of both violent and nonviolent (but serious) disciplinary infractions during his incarceration, and also because of the lack of any meaningful re-entry planning. By the time of the hearing on his IRAA motion, Jackson had incurred a total of forty-five disciplinary violations during his imprisonment, many of them of heightened severity. His prison offenses included an attempted killing of another inmate, whom Jackson had stabbed with a homemade knife; several other injurious assaults at various times against both other inmates and prison staff; possession of a dangerous weapon on multiple occasions; and possession of illegal drugs. And as the government emphasized, Jackson did not stop perpetrating such violations as he got older; he committed serious assaults when he was between thirty-five and thirty-eight years of age, and was found in possession of narcotics (opium alkaloids, amphetamines, and heroin) in his prison cell at the age of forty.

The government argued that this was "not the conduct of a rehabilitated individual," and that Jackson's "continued and recent violent conduct demonstrate[d] that he remain[ed] a danger to the community."

After a hearing, the court denied Jackson's motion in a written order.[2]  The court found that Jackson met the "threshold requirements for IRAA relief," as he had been sentenced for an offense committed before his twenty-fifth birthday and had served at least fifteen years in prison.  The court therefore proceeded to address and make findings with respect to each of the eleven factors it was required to consider by the IRAA.  The court found that four of those factors weighed in favor of a sentence reduction, specifically Jackson's youth at the time of the offense (factors one and ten), and the "significant trauma and abuse" he had endured as a child (factors two and eight).[3]  However, for reasons we discuss below, the court found that factor ten weighed only marginally in Jackson's favor.[4]

---

[2] It was not an evidentiary hearing, although it conformed to the requirements of D.C. Code § 24-403.03(b)(2).  Jackson and his sister spoke at the hearing, but not as witnesses subject to cross-examination, and the court did not take other testimony.

[3] D.C. Code § 24-403.03(c)(1), (2), (8) and (10).

[4] In full, the court concluded as follows regarding factor ten:

> The Court agrees with defendant that this factor favors a reduction in defendant's sentence, although not to a significant degree.  He was twenty-years old at the time of

In the court's view, five statutory factors weighed more heavily against reducing Jackson's sentence at this time. The most consequential of these, in the court's assessment, were factors three, five, and nine. Factor three directs the court to consider "[w]hether the defendant has substantially complied with the rules of the institution to which the defendant has been confined."[5] And factor five directs the court to assess "[w]hether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction."[6] As to factor three, the court found that Jackson's record of numerous and seriously violent disciplinary infractions over a twenty-year period in federal custody demonstrated that he had not substantially complied with the rules of the institutions in which he was confined.[7] And as for factor five, the court stated that "[b]ased on [Jackson's]

---

the murder and the Court therefore considers the "mitigating qualities of youth" that are the bases for the decisions in *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v. Alabama*, 567 U.S. 460 (2012), and the bases for the D.C. Council's enactment of the IRAA.

[5] *Id.* § 24-403.03(c)(3).

[6] *Id.* § 24-403.03(c)(5).

[7] In discussing factor three, the court also found that Jackson's participation in prison programming had been lackluster and less than successful. Although Jackson had participated in over two thousand hours of educational programming between November 2004 and May 2023, the court found he had yet to obtain his GED and had "not completed many programs . . . to improve the likelihood that he will be able to successfully transition back into the community when he is released from prison."

continued history of infractions," it "does not believe that [Jackson] has matured significantly since he facilitated this murder in 2001."[8]

The court also found that factor nine, which required it to consider Jackson's "role in the offense" and the involvement of others,[9] weighed against him, for it was undisputed that Jackson had a "substantial" role in causing Smith's death by ordering Ashley to "take care" of Smith.[10]

The remaining two factors—factors seven and eleven—were neutral because they weighed neither for nor against reduction of the sentence.

Ultimately, after considering the eleven statutory factors, the court said it could not make the findings necessary to grant sentencing relief under the IRAA— that Jackson "is not a danger to the safety of any person or the community and that

---

[8] The court thus rejected Jackson's sister's opinion that he had undergone a positive transformation in prison. And the court attached little weight to her commitment to support Jackson, as there was "no clear plan where [Jackson] will work or the length of time that he would live with [his sister] to ensure he fully participates in his re-entry" into the community.

[9] D.C. Code § 24-403.03(c)(9).

[10] Other statutory factors that counted against Jackson included the opposition to his motion by the United States Attorney and the murder victim's family, *see id.* § 24-403.03(c)(4) and (6).

the interests of justice warrant a sentence modification."[11] To the contrary, the court

found, Jackson:

> [D]oes currently pose a danger to the safety of any person or the community because he has not substantially complied with the rules of the institutions in which he has been incarcerated and has not developed a greater sense of maturity and judgment, even though he has a greater support network than he had at the time of the offense . . . . [Jackson's] record of incarceration over the past twenty years has been unsatisfactory, and he has not taken substantial steps to rehabilitate himself while incarcerated and prepare for re-entry upon his release.[12]

For much the same reasons, the court further concluded that the interests of

justice did not favor granting IRAA relief to Jackson.

## II.

We review the denial of an IRAA motion for abuse of discretion.[13] Jackson

claims the Superior Court abused its discretion in two respects: first, he contends

that the court failed to consider his "personal circumstances that support an aging

out of crime," as required by factor ten; and second, he contends that the court also

---

[11] D.C. Code § 24-403.03(a)(2).

[12] Moreover, the court said, Jackson "also has not developed a thoughtful plan for re-entry."

[13] *Bishop*, 310 A.3d at 641.

failed to consider properly whether "another person" was involved in the murder for which appellant was convicted, as required by factor nine. We address these contentions in that order.

**A. Factor Ten**

Factor ten provides that the court, in determining whether to reduce a term of imprisonment under the IRAA, shall consider:

> The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison . . . and the defendant's personal circumstances that support an aging out of crime.[14]

The D.C. Council added the final clause (requiring consideration of "the defendant's personal circumstances that support an aging out of crime") when it amended the IRAA in 2021.[15] "[T]he purpose of this clause is to mandate consideration of how the movant has changed [if at all] between the time of the underlying offense and the time of his or her IRAA motion."[16] In effect, therefore,

---

[14] D.C. Code § 24-403.03(c)(10).

[15] *See Bishop*, 310 A.3d at 643.

[16] *Id.* at 644.

factor ten identifies two considerations: (1) the "diminished culpability" of younger offenders in general based on the "hallmark features of youth," and (2) whether the "personal circumstances" of the particular defendant before the court indicate an "aging out of crime" by the time of the motion. This court has held that the "hallmark features of youth" consideration is "unconditional and categorical"; "the trial court may not inquire, on a case-by-case basis, whether or to what extent the 'hallmarks of youth' played a role in the underlying offense[,]" but must take the immature defendant's diminished culpability as a given.[17] In contrast, the court "may, however—consistent with the second clause . . .—consider the extent to which a movant's personal circumstances support an aging out of crime."[18]

The court in this case quoted the entire amended factor ten in its order, and we therefore are confident that the court was aware of the "aging out" clause. However, Jackson faults the court for failing, when it discussed factor ten, to address explicitly "whether[] and to what extent" he had aged out of crime by the time of his IRAA motion.

In our view, this objection is not well taken, because the court did address the very issue in its order just before it discussed factor ten, and Jackson has not

---

[17] *Id.* at 645, 647.

[18] *Id.* at 647.

identified any evidence relevant to the "aging out" question that the court failed to consider. The court performed the necessary inquiry when it reviewed Jackson's "personal circumstances" in the two decades following his offense and found that Jackson had continued to commit violent and other serious crimes throughout that period, even as he turned forty years of age; that (contrary to the unsubstantiated opinion of his sister) Jackson had not matured during his decades in prison; and that he had not taken substantial steps to rehabilitate himself or prepare himself for re-entry into the community. These findings plainly signified that Jackson had *not* "aged out" of crime. This meant that while the mitigating quality of Jackson's immaturity when he committed his offense was a point in his favor (which the court recognized explicitly), it was outweighed by Jackson's failure thereafter to reform and age out of crime—a failure that evinced his continuing dangerousness as a full adult and hence counted against granting his IRAA motion for a reduction of his sentence. Thus, the evidence, the court's findings, and the applicable law all supported the court's specific conclusion respecting factor ten, which was that—based only on the "mitigating factors of youth"—factor ten "favors a reduction in [Jackson's] sentence, although not to a significant degree." In reaching that conclusion, the court hardly needed to repeat the detailed findings it already had

made that Jackson had not aged out of crime, a failure that limited the applicability of factor ten.[19]

### B. Factor Nine

Factor nine also was amended by the Council in 2021.[20]  Prior to the amendment, factor nine directed the court to consider "[t]he extent of the defendant's role in the offense and whether and to what extent *an adult* was involved in the offense" (emphasis added).  The amended version substituted the words "another person" for "an adult."  The trial court was aware of the amended language—it accurately quoted that language during Jackson's IRAA hearing.  In its written order, though, the court mistakenly quoted the pre-amendment version.  Jackson seizes on this mistaken citation to assert that the court failed to consider properly the role of Jackson's co-defendant Ashley in the commission of the murder, to Jackson's detriment.  Jackson speculates that in the absence of any evidence Ashley was an adult, the court might have believed his involvement was not relevant in assessing

---

[19] *Cf. Bishop*, 310 A.3d at 644 ("[A] trial court's decision not to robustly discuss every piece of evidence under each relevant factor might not, by itself, warrant reversal.").  This is not a case, like *Bishop*, in which a remand was necessary because the trial court "both cited outdated statutory language and neglected to discuss the considerations reflected in the current version of the statute" or particular personal circumstances that supported a sentence reduction.  *Id.*

[20] *See* Omnibus Public Safety and Justice Amendment Act of 2020, D.C. Law 23-0274, 68 D.C. Reg. 4792 (2021); *see also* D.C. Council, Report on Bill 23-0127, at 18 (Nov. 23, 2020).

Jackson's own culpability.[21]  But Jackson provides no support for this speculation, and the record refutes it.

The record does not disclose whether Ashley was an adult or a minor.  Jackson himself did not suggest this was relevant to his IRAA motion; he did not contend, for example, that he was motivated to participate in the offense by peer pressure (or Ashley's influence in any way).[22]  However, the court did not ignore, minimize, or extenuate Ashley's role in the murder of Larry Smith to the detriment of Jackson in any manner.  The court considered the different roles of Jackson and Ashley, and its analysis and conclusion fully complied with the requirements of factor nine.  The court did not find that this factor was irrelevant or weighed against Jackson on the supposition that Ashley was not an adult.

The relevant facts were not in question.  The court recognized that it was Ashley who personally committed the murder, and that Jackson was "not at the scene and did not shoot" Smith himself.  But it was Jackson who directed Ashley to "take

---

[21] *Cf. Henny v. United States*, 321 A.3d 621, 628 n.4 (D.C. 2024) (trial court mistakenly applied the pre-amendment version of factor nine and "counted that as a factor against Henny's release because there was no evidence that any of Henny's accomplices in [the decedent's] murder were adults" who might have swayed the younger defendant).

[22] *Cf. Bryant v. United States*, 341 A.3d 586, 593 (D.C. 2025) (holding that factor nine requires courts to consider mitigating circumstances underlying the crime, including any provocative actions by other involved persons).

care" of Smith so that Jackson could continue to sell crack cocaine where he wished. That was why, in addressing factor nine, the court found "there can be little doubt that [Jackson] had a substantial role in causing the death of Larry Smith." There were no mitigating or extenuating circumstances—no claim or indication, for example, that Jackson was subjected to pressure of any kind from Ashley. (If anything, it was evidently Jackson who pressured Ashley to commit the crime.) And as the court noted, Jackson himself admitted in his IRAA motion that his participation in the murder was "significant," and "he took responsibility for his actions in open court" at the hearing on the motion.

The misquotation of factor nine thus did not lead the court to misapprehend the facts or otherwise err in assessing Jackson's role in the offense. The court properly found that Jackson had a substantial (indeed, motivating) role in the murder and permissibly weighed factor nine against his motion for an early release from prison.

Although we find the trial court's analysis of factors nine and ten to have been adequate in the instant case, we think a cautionary admonition may be in order. It is fair to say that the court's analysis of factors nine and ten was rather concise; it was not unduly conclusory only because it was well grounded in the discussion and findings the court previously had reached and articulated in its opinion. In general,

our case law indicates that a fuller, more explicit discussion of factors nine and ten would have been the better and safer course for the trial court to follow. Our cases have emphasized that, in evaluating IRAA petitions, the trial court must make clear in its opinion "*how* the statutory factors inform[] its determinations regarding dangerousness and the interests of justice" to ensure that this court can review the opinion adequately.[23] Thus, the trial court should take care to specify explicitly the entire factual foundation underlying its assessment of *each factor* so that there is no ambiguity or uncertainty about the adequacy of the court's consideration and the basis for the court's determination with respect to any factor—even though that may necessitate repeating what the court has already said in addressing other factors.

## III.

For the foregoing reasons, we affirm the order of the Superior Court denying appellant's motion under the IRAA for a reduction of his sentence.

*So ordered.*

---

[23] *Bishop*, 310 A.3d at 637 (emphasis added); *see also Doe v. United States*, 333 A.3d 893, 911 (D.C. 2025) (noting the fact-intensive inquiry in assessing sentencing and the specific consideration required for each enumerated factor).